

# Missouri Court of Appeals

### Southern District

#### Division Two

| | | |
|---|---|---|
| MARY ANN SMITH, d/b/a SMITH'S KENNEL, | ) ) ) | |
| Plaintiff-Appellant, | ) ) | |
| vs. | ) ) | No. SD33431 |
| THE HUMANE SOCIETY OF THE UNITED STATES and MISSOURIANS FOR THE PROTECTION OF DOGS, | ) ) ) ) ) | **Filed: June 29, 2015** |
| Defendants-Respondents. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF DENT COUNTY

Honorable Ronald D. White, Special Judge

## REVERSED AND REMANDED

Mary Ann Smith ("Plaintiff") appeals the trial court's dismissal with prejudice of her fourth amended petition. The petition alleged causes of action for defamation and for false light invasion of privacy. We reverse the trial court's judgment because the allegations in the context of the petition cannot, as a matter of law, be declared to be "opinion" and the petition stated a cause of action for false light invasion of privacy.

1

**Standard of Review- Defamation**

> An appellate court reviews a trial court's grant of a motion to dismiss *de novo*. *Lynch v. Lynch*, 260 S.W.3d 834, 836 (Mo. banc 2008). It will consider only the grounds raised in the motion to dismiss in reviewing the propriety of the trial court's dismissal of a petition, and, in so doing, it will not consider matters outside the pleadings. *Brennan By and Through Brennan v. Curators of the Univ. of Mo.*, 942 S.W.2d 432, 434 (Mo.App.1997). This Court considers solely whether the grounds raised in the motion supported dismissal.

*City of Lake Saint Louis v. City of O'Fallon*, 324 S.W.3d 756, 759 (Mo. banc 2010).

We review "the petition 'in an almost academic manner, to determine if the facts alleged meet the elements of a recognized cause of action . . . .'" *Id.* (quoting *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 306 (Mo. banc 1993)). We take the "plaintiff's averments as true and liberally grant[] plaintiff all reasonable inferences." *Id.*

Additionally, the exhibits to Plaintiff's fourth amended petition can be considered in determining whether the statements in question are, as a matter of law, protected opinion under the totality of the circumstances. "An exhibit to a pleading is a part thereof for all purposes." Rule 55.12; section 509.130.[1]

> Under Rule 55.12, "[a]n exhibit to a pleading is a part thereof for all purposes." When considering a motion to dismiss for failure to state a claim, "[w]e also consider exhibits attached to the petition . . . as part of the allegations." *Armistead v. A.L.W. Group*, 155 S.W.3d 814, 816 (Mo.App. E.D. 2005). The fact that the trial court considered the terms of the Curators' self-insurance plan did not convert their motion into one for summary judgment.

*Hendricks v. Curators of University of Missouri*, 308 S.W.3d 740, 747 (Mo.App. W.D. 2010)

---

[1] All rule references are to Missouri Court Rules (2015), and all references to statutes are to RSMo 2000, unless otherwise specified.

To recover in a defamation case, a plaintiff needs to plead and prove the unified defamation elements set out in MAI 23.06(1) and 32.12. *Nazeri*, 860 S.W.2d at 313.[2] Paraphrased from MAI, those elements are: (1) defendant published a statement (unless the statement is substantially true), (2) defendant was at fault in publishing the statement, (3) the statement tended to expose plaintiff to hatred, contempt or ridicule, or deprive the plaintiff of the benefit of public confidence and social associations, (4) such statement was read by someone other than the plaintiff, and (5) plaintiff's reputation was thereby damaged. Therefore, because this is a defamation case, we accept as true Plaintiff's allegations that certain statements made by Defendants are false and we consider the totality of the circumstances to determine whether those statements are protected "opinion" statements.

**Standard of Review- False Light Invasion of Privacy**

Our high court has not been presented with a case in which it recognized the tort of false light invasion of privacy although the tort has been recognized by the Eastern District of this Court in *Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319, 324-25 (Mo.App. E.D. 2008). In *Sullivan v. Pulitzer Broadcasting Co.*, 709 S.W.2d 475 (Mo. banc 1986), the Supreme Court of Missouri set forth the situation in which such a tort might be plead.

> It may be possible that in the future Missouri courts will be presented with an appropriate case justifying our recognition of the tort of "false light invasion of privacy." The classic case is when one publicly attributes to the plaintiff some opinion or utterance, whether harmful or not, that is false, such as claiming that the plaintiff wrote a poem, article or book which plaintiff did not in fact write. W. Prosser & P. Keeton, *supra*, at 863. *E.g.*, *Kerby v. Hal Roach Studios*, 53 Cal.App.2d 207, 127 P.2d 577 (1942). Another situation, although possibly actionable under defamation law, is when one uses another's likeness in connection with a story that has no bearing on the plaintiff. In *Crump v. Beckley*

---

[2] At the time *Nazeri* was written, the MAI sections were 23.01(1) and 23.01(2). *Nazeri*, 860 S.W.2d at 313.

3

*Newspapers, Inc.*, 320 S.E.2d 70 (W.Va.1984), for example, the defendant published plaintiff's picture next to a story about the problems faced by women coal miners, although the plaintiff did not experience any of the problems related in the story. *See also Leverton v. Curtis Publishing Co.*, 192 F.2d 974 (3rd Cir.1951); *Peay v. Curtis Publishing Co.*, 78 F.Supp. 305 (D.C.Cir.1948).

Recognizing the many ancillary questions that will arise and the confusion that now engulfs this area of the law, we hesitate under the facts of this case to decide whether or not to denominate a separate tort for "false light invasion of privacy." This Court is not confronted with a situation where a party alleges that another has created a false impression in the public eye. Nor is this a case such as *Crump*, *supra*, where the plaintiff's likeness (picture) improperly created the impression that the plaintiff encountered the problems discussed in the story.

*Id.* at 480-81.

We therefore review the pleadings to determine whether Plaintiff appropriately plead that Defendants made statements which created a false impression in the public eye.[3]

**Pleadings**

Plaintiff sued Defendants in March 2011 for defamation and false light invasion of privacy. In a fourth amended petition filed in April 2014, Plaintiff alleged the following:

1. "Defendants, acting in concert" "authored" and "caused to be published" "a report entitled 'Missouri's Dirty Dozen'" ("Report"), a summary report ("Summary"), a press release and an article. The Report, Summary, and press release were released and

---

[3] We understand that the tort of "invasion of privacy, putting one in a false light" has not been fleshed out by cases in Missouri. The key element appears to be placing the plaintiff before the public in a false light.

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

RESTATEMENT (SECOND) TORTS § 652E (1977); *see also* Dean Prosser, *Privacy*, 48 Cal LR 383, 386 (1960); and Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, THE LAW OF TORTS (2d ed. 2011) §582.

issued "at a press conference on October 5, 2010."  The article was released on October 5, 2010.

2.  The Report

stated that Plaintiff's dog kennel was one of the "Dirty Dozen", listed "Mary Ann Smith, Smith's Kennel, Salem" as being among "the worst puppy mills in Missouri", and stated that "Missouri's Dirty Dozen were selected as examples of some of the worst licensed kennels in the state, based upon the number and severity of state and/or federal animal welfare violations."  The report further indicated "availability of photographs to verify the conditions was also a factor in some cases."  Defendants, acting in concert, said of the "Dirty Dozen":  "One thing they have in common is atrocious violations of basic humane standards for dogs in their care."

3.  The press release

included the statement:  "These puppy mills were singled out from the hundreds of high-volume commercial breeders in Missouri for repeatedly depriving dogs of the basics of humane care, such as food, shelter from the heat and cold and/or basic veterinary care according to state and/or federal inspection reports for each dealer . . . ."  It went on to state:  "At puppy mills in Missouri, dogs are crammed into small and filthy cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection."  In that release, [it was] stated:  ["]These puppy mills have an undeniable record of unconscionable violations of the minimal humane care standards in place, according to our study of their records."

4.  The article

contain[ed] the following statements:  "HSUS researchers identified these Dirty Dozen puppy mills and eight dishonorable mentions[,]" and "[t]his painstakingly documented report synthesizes information gleaned from state and federal inspection reports, including enforcement records, animal care violations, and photographs, and reveals shocking abuses and mistreatment of dogs at the states (sic) largest puppy mills."

5.  Defendants, "acting in concert" "authored" an update report ("Update") and press release.  The Update and press release were released and issued on March 9, 2011.

6. The Update

stated that "most of the worst puppy mills in Missouri are still licensed", and included in its report "Mary Ann Smith, Smith's Kennel, Salem" as one of those worst "puppy mills" still licensed. It also stated . . . that "Smith's Kennel remains both USDA licensed and MDA licensed through 2011 despite ongoing repeat violations."

7. The release

stated: "Missourians for the Protection of Dogs released a new report today demonstrating major continuing problems in licensed puppy mills" and repeated the claim that "many of the worst puppy mills in the state are still licensed and in business six months after their histories were made public[.]" It also] stated "[t]he licensed puppy mills identified in this report have an undeniable record of flagrant disregard for even the most minimal humane care standards for dogs."

Plaintiff's fourth amended petition contained three counts. Count I (defamation) alleged that the statements set forth above were (1) "false, scandalous, and defamatory" and (2) "falsely imply that there are other, undisclosed objective facts known to Defendants which support the false statements made by [D]efendants." The publication of these statements damaged Plaintiff's "reputation." In publishing these statements, Defendants were negligent in that they "failed to conduct a full and complete investigation" of Plaintiff's dog kennel and other dog kennels in Missouri. Defendants' conduct "deprived" Plaintiff's "dog kennel business" of "valuable business associations," and Plaintiff has and will "suffer humiliation, embarrassment, hurt, mental anguish, pain and suffering" and has and will be "deprived of public confidence and social and business associations."

Count II (defamation) contains the same allegations except that (1) Defendants are alleged to have made the statements "with knowledge that such statements were false or with reckless disregard for whether such statements were true or false at a time when

6

the Defendants had doubts as to whether such statements were true," and (2) Plaintiff requested punitive damages.

Count III alleged a cause of action for the tort of false light invasion of privacy. Count III (labeled in the petition as "Invasion of Privacy – False Light") alleged the statements set forth above in the Report, October 5, 2010 press release and article

> misrepresented Plaintiff's activities, conditions at her kennel, and inspection reports. These [statements] falsely implied that Plaintiff was a "puppy mill" and was as bad as and engaged in the same conduct as the other kennels listed in the reports, which had more and/or more severe state and/or federal animal welfare violations, falsely implied that Plaintiff committed "atrocious violations of basic humane care standards for the dogs in her care", and falsely implied that Plaintiff was a cruel and inhumane person. The [R]eport also falsely implied that Plaintiff had dogs who had developed interdigital cysts from being "forced to stand continually on wire flooring". The [R]eport also falsely implied that Plaintiff and her kennel "were singled out from the hundreds of high volume commercial breeders in Missouri for repeatedly depriving dogs of the basics of humane care, according to state and/or federal state inspection reports for each dealer," and falsely implied that Plaintiff's kennel was among the worst of the worst and repeatedly deprived dogs of the basics of humane care. It was also falsely implied that Plaintiff's kennel and dogs received little to no medical care, lived in squalid conditions with no exercise, socialization, or human interaction, and are confined inside cramped wire cages for life; dogs at Plaintiff's kennel are crammed into small cramped cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection. These statements further falsely implied that Plaintiff's kennel inspection "violations" were "horrific", and that the state and federal inspections reports of Plaintiff and her kennel "reveal[ed] shocking abuses and mistreatment of dogs". These statements were also made in public without any acknowledgement of explanatory facts and circumstances which, when added to facts recited in the reports and press releases, would naturally tend to create a less objectionable public opinion of Plaintiff and her kennel. For example, no mention was made of various inspections of Plaintiff's kennel which indicted no violation of applicable state or federal animal welfare violations, and the quotes from the inspections were taken out of context and/or edited to make them sound more significant or ominous than they actually were. For all the reasons stated above, the[se] statements] created a false impression of Plaintiff and her kennel in the minds of members of the public and lead others to believe things about her and her kennel that are not true.

7

Count III further alleged the statements set forth above in the Update and March 9, 2011 press release

> misrepresented Plaintiff's activities, conditions at her kennel, and inspection reports. These [statements] falsely implied that Plaintiff was a "puppy mill" and was as bad as and engaged in the same conduct as the other kennels listed in the reports, which had more and/or more severe state and/or federal animal welfare violations, falsely implied that Plaintiff committed "atrocious violations of basic humane care standards for the dogs in her care", and falsely implied that Plaintiff was a cruel and inhumane person. It also falsely implied that Plaintiff continued to have violations similar to those in the original "Dirty Dozen" report, issued in October 2010. It was also published without any acknowledgement of explanatory facts and circumstances which, when added to facts recited in the report, would naturally tend to create a less objectionable public impression of Plaintiff and her kennel. For example, no mention was made of various inspections of Plaintiff's kennel which indicated no violation of applicable state or federal animal welfare violations, and the quotes from the inspection reports were taken out of context and/or edited to make them sound more significant or ominous than they actually were. [The Humane Society] obtained 3 different pictures of the Bulldog they claim was "sick" in the Update Report. Two of the three photographs showed an active, alert healthy appearing dog. The third one showed the dog lying on a pillow, apparently half asleep. Defendants deliberately chose the third photograph to include in the report and excluded the other photographs in an effort to portray the dog, and Plaintiff, in as unfavorable a light as possible. For all the reasons stated above, the . . . [U]pdate [R]eport and March 9, 2011 press release created a false impression of Plaintiff and her kennel in the minds of members of the public and led others to believe things about her and her kennel that were not true.

Count III also alleged that these statements in the Report, October 5, 2010 press release, article, Update Report, and March 9, 2011 press release "contained unreasonable and highly objectionable publicity regarding Plaintiff and her kennel, and attributed to her characteristics, conduct, and beliefs that are false and placed her before the public in a false [light]." The "false light" was "highly offensive to a reasonable person." "Defendants had knowledge of or acted in recklessness [sic] disregard as to the falsity" of these statements and misrepresentations and the "false light in which Plaintiff was

8

placed." Defendants' conduct "deprived" Plaintiff's "dog kennel business" of "valuable business associations," and Plaintiff's

> privacy has been invaded, her history, activities, and beliefs have been misrepresented, her right to be left alone has been compromised and degraded, she has suffered and will in the future suffer mental anguish, emotional distress, as well as personal humiliation and embarrassment from the invasions of her privacy, for which she has incurred, and will incur in the future, costs for counseling and medical treatment.

Plaintiff also requested punitive damages.

The Report was attached to Plaintiff's fourth amended petition as Exhibit A and "incorporated herein as if fully set forth in this petition." The Report also stated the following. The Report is dated October 5, 2010, and, in its first two paragraphs, states:

> Researchers at The Humane Society . . . have spent weeks poring over state and federal inspection reports, Investigators' photographs, and enforcement records received via the Freedom of Information Act to compile a list of some of the worst puppy mills in Missouri, known as "Missouri's Dirty Dozen."
> The purpose of the report is to demonstrate current problems that could be addressed by the passage of Proposition B, which Missouri citizens will vote on in November. Under Proposition B, the Puppy Mill Cruelty Prevention Act, many of these dealers' horrific violations would be backed by stronger enforcement opportunities.

The third page of the Report describes how Proposition B would "help" current law, and states "[r]ead on for further details on Missouri's Dirty Dozen and numerous dishonorable mentions." The last page of the Report again contains information about what Proposition B would require.[4] The Report contains almost one page of information specifically about Plaintiff's kennel including

> [Plaintiff's] Kennel has a history of repeat USDA violations stretching back more than a decade, including citations for unsanitary conditions; dogs exposed to below-freezing temperatures or excessive heat

---

[4] The Summary, which was attached to Smith's fourth amended petition as Exhibit B and "incorporated herein as if fully set forth in this petition," contains similar information about how Proposition B "[c]an [h]elp."

9

without adequate shelter from the weather; dogs without enough cage space to turn and move around freely; pest and rodent infestations; injured and bleeding dogs, dogs with loose, bloody stools who had not been treated by a vet, and much more.

Quotations from federal inspection reports include:

"In the big dog barn there is one dog that had a cherry eye on the right eye. There was one other dog that was noted to have multiple large interdigital cysts bilaterally in front paws and on the hind left paw." (USDA inspection June 2010)

[Note: Interdigital cysts are a common malady in dogs who are forced to stand continually on wire flooring. The cysts are painful and can lead to disabling infections – HSUS]

[Five quotations from other inspection reports ranging in date from November 2005 to June 2009.]

Plaintiff does not allege in her fourth amended petition that any of the information specifically about Plaintiff's kennel in the Report was false.

The October 5, 2010 press release, which was attached to Plaintiff's fourth amended petition as Exhibit C and "incorporated herein as if fully set forth," includes in its title the phrase "Missourians Encouraged to Vote 'Yes' on Proposition B to Curb Puppy Mill Cruelty." The press release later states "[the R]eport demonstrates the urgent need for Missouri's citizens to vote 'yes' on Proposition B, the Puppy Mill Cruelty Prevention Act in November." The press release also includes information on how Proposition B "would amend Missouri law," and a list of organizations, groups and individuals that support Proposition B.

The article, which was attached to Plaintiff's fourth amended petition as Exhibit D and "incorporated herein . . . as if fully set forth," is entitled "A Dozen More Reasons for Supporting Missouri's Prop B." The article also contains information on how Proposition B would "turn this situation around," and solicits financial contributions to help finance the airing of an ad supporting Proposition B.

10

The Update, which was attached to Plaintiff's fourth amended petition as Exhibit E and "incorporated herein as if fully set forth in this petition," is dated March 2011, and refers to the Report as "a list of some of the worst puppy mills in Missouri, known as 'Missouri's Dirty Dozen.'" The Update also states

> [t]his update follows some of those kennels to see whether they are still licensed in 2011. As detailed in this report, the majority of the "Dirty Dozen" kennels are still state-licensed to this day, indicating the ongoing need for the protections that Proposition B, The Puppy Mill Cruelty Prevention Act, will provide.

The Update contains approximately one page of information specifically about Plaintiff's kennel. The only portion of this information that Plaintiff alleges is false is a heading that read "STATUS: [Plaintiff's] Kennel remains both USDA licensed and MDA licensed through 2011 despite ongoing repeat violations." The remainder of the information specifically about Plaintiff's kennel included

> [Plaintiff's] son, now Republican Majority Whip Representative Jason Smith, was once listed in state records as a co-owner of her kennel and has been an outspoken opponent of Proposition B, the Puppy Mill Cruelty Prevention Act and other animal welfare bills.
>
> . . . .
>
> The HSUS has received complaints about sick puppies sold by [Plaintiff's] Kennel, including a Bulldog (pictured) who was sold through a Petland store in 2008 and still suffers from congenital health problems that require daily care. [The caption to the photograph indicated the "Bulldog's owner contacted the Humane Society of the United States in February 2011 . . . ."]
> The kennel's most recent USDA inspection was in June 2010, when the owner was cited for a repeat violation for two dogs that had untreated veterinary problems, a repeat violation for housing in disrepair, and sanitation problems. According to news reports, [Plaintiff's] most recent Missouri state inspection also lists some recent violations. HSUS researchers were not able to obtain a copy in time for this report.

The Update also contains a section entitled "III. New Concerns." The introductory paragraph to this section stated

> Unfortunately, for every kennel on our original Dirty Dozen report that has gone out of business, there is one that we couldn't fit on our original list that continues to demonstrate ongoing severe violations. New candidates for some of the worst kennels in Missouri who were not covered in our original report, include[.]

Finally, the Update contains two sections entitled "Voter Initiative in Jeopardy" and "What Citizens Can Do." The Voter Initiative in Jeopardy section described what Proposition B required, and stated in part

> In November 2010, nearly one million Missouri citizens voted to pass Proposition B, the Puppy Mill Cruelty Prevention Act, into law. Prop B, which is scheduled to take effect in November 2011, will help thousands of dogs suffering across the state. But unbelievably, some legislators are trying to weaken or even overturn Prop B. Approximately a dozen bills have been introduced to attack Prop B since the measure was voted into law.

The What Citizens Can Do section stated

> Missouri citizens can help by making brief polite phone calls to their state senator, representative, and governor to ask them to respect the will of the voters – by voting "NO" on any bill that seeks to weaken or overturn Prop B. Even those who have already called before may want to call again due to new bills being introduced regularly (go to www.Missourifordogs.com to find your representative or senator's information).

> The March 9, 2011 press release, which was attached to Plaintiff's fourth amended petition as Exhibit F and "incorporated herein as if fully set forth," also provided in its opening paragraph

> The Missouri Senate gave its preliminary approval last night to SB 113, sweeping legislation that repeals every core provision of Proposition B, the Puppy Mill Cruelty Prevention Act, and reverts back to the weak laws that allowed the inhumane treatment of thousands of dogs in Missouri's puppy mills. Prop B was favored by voters in 18 of 34 Senate districts. The Senate is expected to take final action on the repeal bill tomorrow.

The press release later added that Proposition B "passed in a majority of state House and state Senate districts."

In May 2014, The Humane Society of the United States ("Humane Society") filed a motion to dismiss Plaintiff's fourth amended petition, and Missourians for the Protection of Dogs ("Missourians for Dogs") joined in the Humane Society's motion to dismiss and filed a separate motion to dismiss Plaintiff's fourth amended petition. The Humane Society's motion to dismiss contended that Counts I and II should be dismissed because the statements in question were "protected statement[s] of opinion," and Count III should be dismissed because it fails to state a cause of action for false light invasion of privacy inasmuch as Plaintiff's cause of action, if any, was for defamation and the statements in question were on matters of legitimate public interest.

On June 4, 2014, the trial court granted the Humane Society's motion to dismiss, and dismissed Plaintiff's fourth amended petition with prejudice. The trial court did not decide Missourians for Dogs' separate motion to dismiss.

**Analysis**

*Point I*

In her first point, Plaintiff claims that the trial court erred in granting the Humane Society's motion to dismiss Counts I and II because the statements alleged to be false were not protected statements of opinion that were privileged and not subject to a claim for defamation.

While there is no "wholesale defamation exemption for anything that might be labeled 'opinion,'"[5] in Missouri, a statement of opinion is "protected by an absolute privilege which is rooted in the First Amendment to the United States Constitution" and "do[es] not give rise to a cause of action" for defamation even if "made maliciously or insincerely" unless "the statement of opinion necessarily implies the existence of undisclosed defamatory facts." *Pape v. Reither*, 918 S.W.2d 376, 380 (Mo.App. E.D. 1996). A corollary to this rule is that a statement of opinion is "constitutionally privileged if the facts supporting [it] are set forth" and those facts are nondefamatory and the statement of opinion does not imply other undisclosed facts. *Diez v. Pearson*, 834 S.W.2d 250, 253 (Mo.App. E.D. 1992) (internal citations omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 566 & illustrations 3 and 4 (1977).

Under our standard of review, a statement is not protected opinion and is adequate to permit a claim for defamation to survive a motion to dismiss based on the opinion privilege, if "a reasonable factfinder could conclude that the statement[] . . . impl[ies] an assertion [of objective fact]" (i.e., one "sufficiently factual to be susceptible of being proved true or false"). *Milkovich*, 110 S.Ct. at 2705, 2707; *Nazeri*, 860 S.W.2d at 314 (indicating that if a "reasonable factfinder could conclude that the statement implies an assertion of objective fact," "the petition is not subject to dismissal on grounds of the opinion privilege"); *Castle Rock Remodeling, LLC v. Better Business Bureau of Greater St. Louis, Inc.*, 354 S.W.3d 234, 241 (Mo.App. E.D. 2011) ("we must determine whether the BBB 'C' rating could reasonably have been interpreted as stating actual facts about Castle Rock capable of being proven true or false"); *Benner v. Johnson Controls,*

---

[5] *Milkovich v. Lorain Journal Co.*, 110 S.Ct. 2695, 2705 (1990); *see also Nazeri*, 860 S.W.2d at 314 (noting the United States Supreme Court's rejection in *Milkovich* of a wholesale defamation exemption for anything labeled opinion).

14

*Inc.*, 813 S.W.2d 16, 20 (Mo.App. W.D. 1991) ("[I]n light of *Milkovich* . . ., the question is whether the person has made an assertion that can reasonably be understood as implying provable facts.").

Whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact is "a question of law for the trial court." *Nazeri*, 860 S.W.2d at 314. In deciding the question, the trial court "must examine the totality of the circumstances to determine whether the ordinary reader would have treated the statement as opinion." *Castle Rock*, 354 S.W.3d at 241.

The totality of the circumstances includes whether the statement in question is susceptible to being proved true or false. *Id.* at 241-43. If it is not, the statement is protected opinion. *Id.*; *Milkovich*, 110 S.Ct. 2695 at 2706 ("a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved"). The totality of the circumstances also includes the type of speech in question. As our high court said some years ago – "[t]he highest protection [under the First Amendment] is accorded pure speech touching on matters of public importance." *Henry v. Halliburton*, 690 S.W.2d 775, 784 (Mo. banc 1985) (internal footnote omitted). The Eastern District of this Court also has observed that "[t]he Constitutional protection afforded statements made during public debate on political issues has always been broadly construed." *Ribaudo v. Bauer*, 982 S.W.2d 701, 705 (Mo.App. E.D. 1998).

At this stage of the case where we must take "plaintiff's averments as true and liberally grant[] plaintiff all reasonable inferences," *City of Lake Saint Louis*, 324 S.W.3d 759, we are unable to hold as a matter of law that no reasonable factfinder could

15

conclude the statements alleged to be false in Plaintiff's fourth amended petition imply an assertion of objective fact that is susceptible of being proved true or false. First, and most importantly, the statements called Plaintiff's business a "puppy mill." The publications purport to give facts that supported that claim that Plaintiff's business was a puppy mill, including, inferences that there were photographs available to verify the conditions of the kennels, that the singled out kennels "repeatedly deprive[ed] dogs of the basics of humane care, such as food, shelter from the heat and cold and/or basic veterinary care," that the dogs are " crammed into small and filthy cages, denied veterinary care, exposed to extremes of heat and cold, and given no exercise or human affection." The article claimed those facts were determined from a "painstakingly documented report." In a press release, it was stated that "the licensed puppy mills identified in this report have an undeniable record of flagrant disregard for even the most minimal humane care standards for dogs." These statements imply verifiable factual information, not statements of opinion. Although many of the statements made by Defendants are "opinion," such as whether Plaintiff's kennel was the "worst" of the puppy mills, the contention that Plaintiff's kennel was a puppy mill with the definitions given as to what constitutes a puppy mill was, under the totality of the circumstances in this case, a factual contention.[6]

Plaintiff's first point is granted.

---

[6] Missourians for Dogs asserts other grounds for affirming the trial court's judgment as to Missourians for Dogs. These grounds were raised in Missourians for Dogs separate motion to dismiss, but were not raised in the Humane Society's motion to dismiss. The trial court granted only the Humane Society's motion to dismiss and did not decide Missourians for Dogs' motion to dismiss. As a result, we do not consider the additional grounds raised by Missourians for Dogs as, under our standard of review, we consider only grounds raised in the motion to dismiss that was actually decided.

*Point II*

In her second point, Plaintiff asserts that the trial court erred in granting the Humane Society's motion to dismiss Count III because that count properly stated a cause of action for false light invasion of privacy.

As we noted earlier, the Eastern District of this Court recognized the tort of false light invasion of privacy in *Meyerkord*. In *Meyerkord*, the plaintiff was a former employee of the defendant. 276 S.W.3d at 321. While employed by the defendant, the plaintiff was shown as the registrant for websites registered by the defendant. *Id.* About three years after the plaintiff's employment with the defendant ended, the defendant registered a website that subsequently was used by a third party in a significant marketing campaign, and listed the plaintiff as the registrant for the website. *Id.* at 321-22. The marketing campaign generated criticism of the campaign and those associated with the campaign including the plaintiff. *Id.* at 321. The plaintiff sued the defendant for false light invasion of privacy alleging that "[the defendant] publicly and falsely attributed a website to [the plaintiff]." *Id.* at 322, 321-22, 326. The plaintiff did not plead a claim for defamation. *Id.* at 322. The Eastern District of this Court stated:

> As noted earlier, the Missouri Supreme Court has considered the issue of whether Missouri courts should adopt the tort of false light invasion of privacy, but the Supreme Court concluded it had not yet been confronted with a factually suitable case. We now find that the facts of the present case properly present the issue of false light invasion of privacy and we hold that a person who places another before the public in a false light may be liable in Missouri for the resulting damages.

*Id.* at 325.

Although this is a much closer question, Plaintiff's contention that some of the statements attributed to Defendants were "taken out of context and/or edited to make

17

them sound more significant or ominous than they actually were" supports a claim of false light invasion of privacy. In the Update and March 9, 2011 press release, Plaintiff contends that Plaintiff continued to have violations "similar to those in the original 'Dirty Dozen' report", leading to a false impression that serious violations were continuing after the first report. Plaintiff contends it was deliberately published to put her in a false light without any acknowledgment of the explanatory facts and circumstances which would naturally tend to create a less objectionable public impression of Plaintiff and her kennel. Specifically, the report showed a dog that looked to be a "sick" dog in the report but it was actually a dog sleeping. The gravamen of Plaintiff's false light invasion of privacy count is not that untrue statements caused injury to her reputation, but rather that Defendants' public statements allegedly attributed to her conduct and beliefs associated with irresponsible and disreputable dog breeders that she did not engage in, share or approve. Even if being a "puppy mill" is not a defamatory term, per se, these statements allegedly placed Plaintiff before the public in a false light and caused injury to her right to be let alone. Plaintiff pleads that the actions were done maliciously. She contends that she was wrongly singled out for this publicity because her son is a Missouri politician, who was opposed to Defendants' agenda. Plaintiff's fourth amended petition stated a cause of action for false light invasion of privacy.

Plaintiff's second point is granted.

The trial court's judgment is reversed and the case is remanded to the trial court.

Nancy Steffen Rahmeyer, J. - Opinion Author

Mary W. Sheffield, P.J. - Concurs

Gary W. Lynch, J. - Concurs

18